**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CLERK
US DISTRICT & BANKRUPTCY
COURT

2008 AUG 22 PM 6: 11

| | |
|---|---|
| CORPORATION SERVICE COMPANY, 2711 Centerville Road, Suite 400 Wilmington, DE 19808 | ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| FAIRWINDS PARTNERS, LLC, 2122 P Street, NW, Suite 300 Washington, D.C. 20037 and JOSHUA BOURNE, 2122 P Street, NW, Suite 300 Washington, D.C. 20037 and PHILIP LODICO, 2122 P Street, NW, Suite 300 Washington, D.C. 20037 | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Registered Agent: Matthew F. Hall 1100 Connecticut Avenue, NW, Suite 410 Washington, D.C. 20036 | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

RECEIVED

**FILED**

AUG 2 2 2008

**Clerk, U.S. District and Bankruptcy Courts**

Civil Action No.

Case: 1:08-cv-01465
Assigned To : Friedman, Paul L.
Assign. Date : 8/22/2008
Description: General Civil



**COMPLAINT FOR TRADE LIBEL
AND MISAPPROPRIATION OF TRADE SECRETS**

Plaintiff CORPORATION SERVICE COMPANY ("CSC" or "Plaintiff") alleges as follows:

INTRODUCTION

1.     Plaintiff CSC seeks redress from Defendants JOSHUA BOURNE ("Bourne"), PHILIP LODICO ("Lodico"), and FAIRWINDS PARTNERS, LLC ("FairWinds") (collectively, "Defendants") for (i) spreading false, misleading, and disparaging statements about CSC's business operations to clients and potential clients of CSC and (ii) misappropriating and using CSC's trade secrets and confidential information to compete unfairly against CSC.

## JURISDICTION AND VENUE

2.     Jurisdiction in this Court and in the subject matter of this action arises under the unfair competition laws of the United States, 15 U.S.C. §§ 1051 *et. seq.* (the Lanham Act), 28 U.S.C. §§ 1331, 1338(a).  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1338(b), 1367, and 1332.

3.     Plaintiff is informed and believes and thereon alleges that the amount in controversy in this matter exceeds, exclusive of interest and costs, the jurisdictional minimum.

4.     This Court has personal jurisdiction over Defendants pursuant to DC Code § 13-423, in that Defendants transacted and continue to transact business in the District of Columbia and have caused tortious injury in the District of Columbia and/or have caused tortious injury in the District of Columbia by an act or omission outside the District of Columbia while regularly doing and/or soliciting business in the District of Columbia.  Personal jurisdiction over Defendants is also proper because Defendants reside in, and can be served in, this District.

5.     Venue is proper in this District under 28 U.S.C. § 1391(b).

## PARTIES

6.     CSC is a corporation duly incorporated and existing under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware.

7.     On information and belief, Defendant FairWinds is, and at all relevant times mentioned herein was, a limited liability corporation duly incorporated in the District of Columbia, with its principal place of business in the District of Columbia.

8.     According to the FairWinds website, Defendant Bourne is an individual residing in the District of Columbia.

9.     According to the FairWinds website, Defendant Lodico is an individual residing in the District of Columbia.

10.   On information and belief, Defendants Bourne and Lodico are the Founders and Managing Members of FairWinds.

## BACKGROUND FACTS

11.   CSC is a provider of legal and financial services for many large corporations, law firms and financial institutions.  Specifically, CSC offers corporate identity protection services, including consulting services, corporate compliance and governance services, entity management services, litigation and matter management services, public record document and retrieval services, uniform commercial code services, motor vehicle titling services, registered agent services, and domain name management services.

12.   CSC and/or its predecessor in interest began providing services in this industry sector over 100 years ago and has successfully serviced many large corporations, law firms and financial institutions, including top Fortune 500® companies.

13.   With regard to its corporate identity protection services, CSC is a leading provider of domain name registration and online brand protection solutions, which is complemented by its strategic consultancy services to help protect customers' brands and trademarks.

14.   CSC Corporate Domains, Inc., a wholly owned subsidiary of CSC, is an ICANN-accredited registrar and manages domain names for many Fortune 500® companies, among others.

15.   In 2006, CSC acquired the Corporate Services Division of Register.com, a corporate domain name registrar, in order to expand its corporate domain name management and brand protection operations.

16.   Defendants Bourne and Lodico worked together as Business Development Managers at Register.com in the Corporate Services Division.

17.    After CSC's acquisition of Register.com, Defendants Bourne and Lodico continued in their positions at CSC.  In their capacity as key employees within CSC, Defendants Bourne and Lodico were entrusted with confidential, proprietary and trade secret information including, without limitation, detailed contract information regarding CSC's clients (e.g., billing rates, discounts and services provided), the individual client's particular needs and any historical issues related to a particular client, detailed information regarding the actual domain name portfolios of clients, CSC customs and preferences, key contact information (e.g., customer contacts and leads), and CSC business strategies (i.e., selling and consulting strategies and techniques related to the domain name industry) ("Confidential Information").

18.    Defendants Bourne and Lodico were advised and informed that the Confidential Information was confidential, was to be kept confidential, and was to be used only for the purpose of fulfilling their individual job duties at CSC.

19.    CSC's Confidential Information was and is confidential, proprietary and trade secret information, such that a competitor's acquisition and use of this Confidential Information would permit it to compete unfairly against CSC for domain name management and online brand protections solutions and other similar services.

20.    CSC takes all reasonable steps to prevent the disclosure of its Confidential Information, including, without limitation, keeping such information secure on its computer database, not disclosing the information to competitors, restricting access to such information to a limited number of employees and informing such employees that the information is confidential.

21.    Employees are given access to an employee handbook which sets forth CSC's policies regarding Confidential Information.  Defendants therefore knew or had reason to know that this Confidential Information was confidential, proprietary and trade secret information and that

acquisition and use of this information by them for purposes other than the pursuit of CSC's business was unauthorized and wrongful.

22.    In July 2006, Defendants Bourne and Lodico left CSC and founded FairWinds, an Internet strategy consulting corporation which competes directly against CSC in domain name strategic management services.

23.    On August 13, 2008, Defendants published an article entitled, "The Power of Gripe Sites: Managing the Destructive Potential of 'BrandSucks.com'" as a marketing tool to promote its services and generate sales leads.  A copy of this article is attached as Exhibit 1.  In this article, Defendants stated that it examined domain names that are "BrandSucks" domain names, which are composed of a known brand name followed by the word "sucks."  Specifically, Defendants' data set was based on the names of companies that compose the Global 500 and Fortune 500 lists.  Defendants claimed that only 35 percent of the domains they surveyed were, in fact, owned by the brand owner.

24.    In the article, Defendants specifically referred to a "trend" of CSC serving as a registrar for "brandsucks.com" domain names, based on their "findings" that CSC "processed" the registrations for about 41 percent of all the registered "brandsucks.com" domain names in their data set.

25.    In addition, Defendants stated that "87 percent of CSC's 'brandsucks.com' registrations were done on behalf of Dan Parisi, an infamous domain name speculator and cybersquatter, perhaps best known for maintaining a pornography Web site."  Defendants also stated that "[u]pon finding this trend, FairWinds alerted CSC and at the time of this paper's release [had] yet to receive a comment on the matter."

26.    The article was published at FairWinds' website, http://www.fairwindspartners.com/en/newsroom/perspectives/vol-3-issue-6/background-on-

direct-navigation. In addition to posting the article on the website, Defendants directly distributed the article to many of CSC's customers and competitors. Defendants also requested one of CSC's main competitors, MarkMonitor, Inc., to include the article in its newsletter and marketing materials.

27.    Because they had been CSC employees, and employees of Register.Com prior to CSC's acquisition of that entity, Defendants Bourne and Lodico had access to information regarding CSC's involvement in registering domain names that was not publicly known. On information and belief, using their knowledge of CSC's Confidential Information, Defendants directed their inquiry specifically at "brandsucks.com" domain names, calculating that CSC would be unfairly implicated and targeted in their article. On information and belief, the data set utilized by Defendants in the article was selected and manipulated so as to specifically target and damage CSC.

28.    Defendants' article falsely misrepresented that CSC regularly engages in the practice of registering domain names to trademark infringers and cybersquatters. In fact, the crux of CSC's services is designed to protect the rights of brand owners against such conduct.

29.    Due to the reference to Dan Parisi in Defendants' article, customers would be misled into believing that CSC is engaged in the "trend" or regular practice of registering "brandsucks.com" domain names to third-party domain name speculators and cybersquatters.

30.    Defendants' article misleads customers into believing that their findings regarding CSC's role as the leading registrar of "brandsucks.com" domain names and its seeming connection with a known domain name speculator and cybersquatter are based upon independent and unbiased research. However, the article fails to disclose that Defendants are former employees and direct competitors of CSC, and is neither independent nor unbiased.

31.   Defendants' statements regarding CSC's lack of response to its article were false and misleading because Defendants did not inform CSC of the article or seek comment until the day of the article's release and did not provide CSC with a reasonable opportunity to respond.  When CSC attempted to respond to the article that same day with its comments, CSC was told that it was "too late."

32.   Defendants' statements regarding CSC serving as the registrar that "processed" the registrations of Dan Parisi and the implication that CSC seeks out such third parties were also knowingly misleading.  In fact, CSC does not seek out to register such domain names to such third parties and did not process the "brandsucks.com" domain names of Dan Parisi.  In fact, the domain names of Dan Parisi were inherited from CSC's acquisition of the Corporate Services Division of Register.com.  None of these domain names owned by Dan Parisi are directed to an active website, which Defendants' article failed to include.

33.   Defendants knew the foregoing statements were misleading because the "brandsucks.com" domain names attributed to CSC in the article were inherited from CSC's acquisition of the Corporate Services Division of Register.com.  As key employees in the Corporate Services Division of Register.com at the time of the acquisition, Defendants  Bourne and Lodico had knowledge of this information.

34.   Defendants have published, circulated, encouraged, and acquiesced in the foregoing misrepresentations of fact concerning CSC and its services, which were known to be misleading and were made, or were allowed to be made, with reckless disregard as to their truth or falsity and which have caused harm and damage to CSC, its services, and its business.

35.   On information and belief, Defendants used CSC's Confidential Information, including, without limitation, CSC's current billing rate structure and specific client contract and contact information and approached several of CSC's clients in an attempt to interfere with CSC's

existing customer relationships. This use by Defendants has caused certain of CSC's clients to attempt to re-negotiate or otherwise seek adjustments to the prices they pay for CSC's services.

36. On information and belief, Defendants specifically targeted certain of CSC's clients from whom they could potentially seek new business based on their knowledge and use of CSC's Confidential Information.

37. On information and belief, Defendants willfully, without justification, without privilege, and without CSC's consent, used CSC's Confidential Information to interfere with and damage CSC's client relationships.

38. Defendants' actions were designed specifically to cripple CSC's operations, cause existing customers of CSC to question their business relationships with CSC, and scare off potential new business being sought by CSC, in hopes of destroying CSC's reputation in the industry and eliminating CSC as a competitor.

## FIRST CAUSE OF ACTION

(False Advertising and Trade Libel under the Lanham Act Section 43(a))

39. Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 38, inclusive, as if set forth in full herein.

40. The statements and representations made by Defendant FairWinds of and concerning CSC, included, but were not limited to, advertising, publishing, disseminating and communicating false, misleading, and disparaging statements and unfounded misrepresentations about the business, goodwill, and reputation of Plaintiff, including, without limitation, false, misleading, and disparaging statements that Plaintiff is engaged in a so-called trend of aiding trademark infringers.

41.    The aforementioned false, misleading, and disparaging statements and representations concerning CSC were published, disseminated, or otherwise communicated by Defendant FairWinds.

42.    The aforementioned false, misleading, and disparaging statements and representations made by Defendant FairWinds concerning CSC were published, disseminated, or otherwise communicated by Defendant FairWinds across state borders and in interstate commerce.

43.    The aforementioned false, misleading, and disparaging statements and representations made by Defendant FairWinds concerning CSC were statements and representations of a commercial nature and constituted commercial speech since they were published, disseminated, or otherwise communicated with the intent of increasing Defendant FairWinds' sales and/or decreasing CSC's sales.

44.    The aforementioned statements and acts actually deceived and had a tendency to deceive a substantial segment of the intended audience of potential and actual customers and consumers. These false, misleading, and disparaging statements and the deceptions practiced influenced the purchasing decisions of actual and potential customers and consumers of CSC's services.

45.    CSC has been injured as a direct and proximate result of Defendant FairWinds' conduct. CSC suffered injury to the goodwill and reputation that CSC and its products and services enjoy with the buying public.

46.    The publication of these false, misleading, and disparaging statements and the other acts and conduct of Defendant FairWinds as alleged above, constitute false and deceptive trade practices in violation of Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a), which caused harm and damage to CSC's business and products/services.

47.   Defendant FairWinds deliberately, willfully, and in bad faith committed the aforementioned violations of the Lanham Act. The aforesaid conduct of Defendant FairWinds constitute an exceptional case under 15 U.S.C.A. § 1117(a). CSC is therefore entitled to recover enhanced damages and reasonable attorneys' fees incurred in this action.

48.   Upon information and belief, Defendant FairWinds has engaged in an ongoing practice of the conduct complained of herein and, unless enjoined, will continue such conduct, all to CSC's irreparable damage.  CSC has no adequate remedy at law and is suffering irreparable harm as a result of the acts complained of herein.  CSC is also suffering damages in an amount not yet determined.

49.   As a direct and proximate result of Defendant FairWinds' conduct, CSC is entitled to damages, in an amount to be proven at trial and a preliminary and permanent injunction enjoining and restraining Defendant FairWinds, and its respective agents, servants and employees, and all persons acting in concert with them from engaging in the aforesaid acts.

## SECOND CAUSE OF ACTION

(Misappropriation of Trade Secrets)
(District of Columbia Uniform Trade Secrets Act – DC Code § 36-401 et seq.)

50.   Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 49, inclusive, as if set forth in full herein.

51.   CSC's Confidential Information constitutes trade secrets within the meaning of DC Code § 36-401.

52.   Defendants Bourne and Lodico wrongfully acquired the Confidential Information regarding CSC, its customer lists, pricing schedules, specific contract terms, customer contact information, by use of false pretenses, namely by falsely representing to CSC that Defendants would use such information only in furtherance of duties for and on behalf of CSC, thereby inducing CSC to provide Bourne and Lodico with access to such Confidential Information.

53.    Defendants Bourne and Lodico acquired CSC's Confidential Information while they were employees of CSC thereby giving rise to a duty of Defendants Bourne and Lodico to maintain the secrecy of CSC's Confidential Information and limit its use.

54.    Defendants knew or had reason to know that this Confidential Information was confidential, proprietary and trade secret information and that acquisition and use of this information by Defendants was wrongful and improper.

55.    Defendant FairWinds additionally knew that it obtained CSC's confidential information through persons who owed a duty to maintain its secrecy or limit its use.

56.    CSC's Confidential Information is confidential, proprietary and trade secret information, that has actual or potential independent economic value from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use.   The acquisition and use of this Confidential Information by CSC's competitors would permit it to unfairly compete with CSC for domain name management and online brand protections solutions and other similar services.

57.    CSC has taken all reasonable steps to prevent the disclosure of its Confidential Information, including without limitation, keeping such information secure on its computer database and restricting access to such information to a limited number of employees and informing those employees that the information was confidential.

58.    Defendants' misappropriation, disclosure, and use of said Confidential Information was, on information and belief, in bad faith, willful and malicious.

59.    Defendants' actual misappropriation and current use and disclosure of CSC's Confidential Information should be enjoined.  Specifically, among other examples, CSC faces continued interference with its existing contracts as Defendants use and profit from their wrongful use of CSC's Confidential Information, including the identity of CSC's clients, client

contract information, existing pricing schedules and billing rates. In the absence of such an

injunction, CSC will continue to suffer irreparable harm for which there is no adequate remedy at

law.

60.    As a direct and proximate result of Defendants' misappropriation of CSC's

Confidential Information, CSC is entitled to recover actual loss and Defendants' unjust

enrichment, in an amount to be proven at trial.

**WHEREFORE**, Plaintiff prays for judgment as follows:

1.    That this Court enter judgment in favor of CSC and against Defendant FairWinds on

Count I and against all Defendants on Count II;

2.    That this Court preliminarily and permanently enjoin Defendants, and its officers

directors, employees, agents, servants, attorneys, if any and all persons, firms, corporations,

franchisees and associates in concert or participation with Defendant from doing any of the

following:

> (a) directly or indirectly making any use of the Confidential Information acquired
>
> from CSC;
>
> (b) publishing, circulating or causing the publication or circulation of the
>
> statements or any similar false and misleading statements purporting to associate
>
> CSC or any of its subsidiaries or affiliated corporations, employees, products, or
>
> services with aiding trademark infringers and cybersquatters, or causing the
>
> publication or circulation of any false, misleading or disparaging statements about
>
> CSC's products and services;
>
> (c) committing any of the aforesaid unfair methods of competition, unfair or
>
> deceptive acts or practices;

(d) engaging in any conduct violative of 15 U.S.C. § 1125(a) (false advertising and trade libel).

3.    An accounting;

4.    That Defendant FairWinds be required to pay the following damages pursuant to 15 U.S.C. 1117 (§ 35 of the Lanham Act):

       (a)    Defendants' profits;

       (b)    CSC's damages;

       (c)    Costs; and

       (d)    Treble damages;

5.    That this Court award CSC its costs of suit and attorneys' fees in this action;

6.    That Defendants be required to pay to CSC, Defendants' profits and the actual damages suffered by CSC as a result of Defendants' acts, and that such damages be trebled because of the willful acts described in this Complaint, all of which were in disregard of CSC's rights; and

7.    That this Court grant such other and further relief as it may find necessary or proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED: August 22, 2008

Respectfully submitted,

By _____

PILLSBURY WINTHROP SHAW PITTMAN LLP
Deborah B. Baum (DC Bar No. 393019)
Thomas G. Allen (D.C. Bar No. 484425)
2300 N Street, NW
Washington, D.C. 20037-1128
(202) 663-8000
deborah.baum@pillsburylaw.com
thomas.allen@pillsburylaw.com

Of Counsel:

PILLSBURY WINTHROP SHAW PITTMAN LLP
RICHARD H. ZAITLEN
JENNIFER SO
725 South Figueroa Street, Suite 2800
Los Angeles, CA  90017-5406
(213) 488-7100
richard.zaitlen@pillsburylaw.com

Attorneys for Plaintiff
CORPORATION SERVICE COMPANY

# EXHIBIT 1

**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

# The Power of Internet Gripe Sites

## *Managing the Destructive Potential of "BrandSucks.com"*

### *Background on Direct Navigation*

For any consumer, navigating the Internet can be challenging task. Given the omnipresence of search engine portals such as Google and Yahoo!, one might assume that Internet users primarily use search engines to reach their intended destinations online. However, WebSideStory's StatMarket division (now a part of Omniture) estimated that more than 67 percent of global Internet users arrive at Web sites by direct navigation.[1]

This type of navigation, also known as type-in or direct search, is defined as traffic derived from a visitor arriving at a Web site by keying a word or phrase into the browser address bar rather than following a link, a bookmark, or a search engine's results. Typically, direct navigation users type in generic terms or brand names plus generic terms. For example, a direct navigation user may type in realestate.com when looking for information on purchasing a home or may type in remaxagent.com when looking for a RE/MAX real estate agent.

Even the most savvy of users can miss a keystroke and unintentionally stumble upon an unexpected site. They can be unwittingly exposed to overt schemes involving spyware, phishing or at the very least, a poor experience while searching for a product or brand site. Unfortunately, this reality often prompts brand owners to focus primarily on

Copyright © 2008 - Duplication and Redistribution Prohibited.

08 1465

**FILED**

AUG 2 2 2008

Clerk, U.S. District and
Bankruptcy Courts

**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

Perspectives Volume 3, Issue 6
Gripe Sites

defensive strategies while neglecting to critically evaluate which domains they should own and how to optimize their existing domain portfolio to benefit their business. As a result, it has become fairly standard practice to cast a wider net than necessary and register large quantities of domains to keep them out of the hands of others. Many of the domains that are obtained in this way do not generate traffic and are therefore relatively useless; others will go underutilized because they remain mired in a sea of domains stockpiled by marginally advised corporations. While some of these domains will be properly developed into functional sites or redirected to useful Web content that already exists under a different moniker, others will lead to a dead end for anyone who types them in.

## *Defensive Strategies to Prevent Gripe Sites*

Since gripe sites are often difficult to reclaim, one common defensive strategy is the registration of *brandsucks* domains by brand owners. These domains are composed of a known brand, followed by the word "sucks." The addition of "sucks" to the brand is one of the simpler and more intuitive pejorative terms and brand owners often seek advice on how to handle these domains. "Sucks.com" is the rightmost anchor of nearly 20,000 domains registered today. Two thousand domains have "stinks.com" on the right and about the same number of domains begin with the term "boycott." "Sucks" is evidently the preferred violation of brands that domain registrants want to protest or tarnish. Because of this, we chose to focus on "sucks" sites and gathered data from these domains based on a variety of perspectives. The purpose of this paper is to take a look at the ways in which brands deal with this dilemma in hopes of establishing a set of best practices; which will act as one component of an overall domain name strategy. We also

---

[1] Cook, John. "Marchex Solidifies Its Web Presence Deal Lets Company Move Into Direct Navigation." 24 November 2004. The Seattle Post-Intelligencer. Online. 4 June 07.

Copyright © 2008 - Duplication and Redistribution Prohibited.



**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

intend to trace the origins of harvesting potential gripe sites and question whether this strategy truly serves the brand owner's best interests.

### *Methodology*

For this study we looked at the names of companies that compose the Global 500 and Fortune 500 lists that are assembled based on their annual revenue by Time Inc.'s Fortune magazine; the scope of this data set allowed us to look at high level, worldwide trends. We created the list of domains we examined by taking the names of these companies, removing "inc," "corporation" and other non-core terms, and adding the word "sucks" as a suffix. Since many of the most well recognized brands are for products (example: Marlboro) rather than trade names, we also included Interbrand's 100 Best Global Brands. We produced a total of 1,058 domain names for our data set, all in the dot-COM TLD. For brands that have multiple words in their moniker, the words were joined without the use of a hyphen (for example, Goldman Sachs became goldmansachssucks.com). If the hyphen is already part of the brand (for example, Coca-Cola), the words in the brand were both hyphenated and unhyphenated to create domains (coca-colasucks.com and cocacolasucks.com).

After compiling the list, we used proprietary FairWinds tools and publicly available Whois resources to gather information on whether each *brandsucks* domain in our data set was registered and by whom it was registered. We then visited the sites to record what they were being used for at that particular moment in time. In a separate data set, we gathered and examined every UDRP complaint that was filed with World Intellectual Property Organization (WIPO) and National Arbitration Forum (NAF) regarding a "sucks" domain. The data from WIPO and NAF was exhaustive so it includes "sucks" domains beyond the domain sample set we constructed leveraging the Fortune

Copyright © 2008 - Duplication and Redistribution Prohibited.

**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

and Interbrand lists. After collecting and sorting all this information, we were able to make observations about general registration and usage trends that surround the *brandsucks* domain, and draw conclusions about the domain strategies that are being practiced today – as well as what should be avoided.

### *Observations*

Only 35 percent of the *brandsucks* domains we surveyed are owned by the brand found within the domain. Forty-five percent of the domains are currently available for registration and each one presents an opportunity for brand owners to reach out to the Internet community or to prevent a potential public relations nightmare. These sites garner traffic by luring legitimate buyers searching for the brand in addition to disgruntled customers and those that are simply curious to see the content on a potential gripe site. Brand owners are advised to take a serious look at the traffic that these names garner and the kind of unique marketing opportunity they can afford.

Loews, the popular movie theater chain (recently spun off from Loews Corporation to AMC), is the domain registrant of loewssucks.com and placed a "Guest Satisfaction Survey" on the page that resolves when users type this domain in their browser address bars. Loews makes good use of the domain in a way that allows it to reach out to customers and get feedback about their experiences. If a customer stumbled upon the site by accident, then he or she is likely to be impressed with the brand's dedication to customer service. If a customer was looking for a gripe site, then the brand has at least tried to mitigate whatever poor experience led that customer to look for such a site. By doing so, the brand is essentially getting a second chance at providing a positive experience to their customer and restoring faith in their brand.

Copyright © 2008 - Duplication and Redistribution Prohibited.



Loews, however, is one of the only brands in our study to optimally utilize a *brandsucks* domain. The percentage of brand-owned "sucks" sites that actually end up working against the brand is extraordinarily high. Eighty-three percent of the Web sites that go to a company-sponsored site simply resolve to the brand's main homepage. This can be damaging to the brand because companies that do this are associating their brand with a memorable and negative domain name.

A company can pretend as though the "sucks" part of the domain isn't there, but that does not mean that customers will do the same. Redirecting a *brandsucks* domain is not like redirecting a typo, where the Internet user may not even notice the difference between the name that they typed and the name that the page resolves to. A "sucks" domain is distinct and users who type *brandsucks* domains in the browser are doing so for a reason. Besides Loews, Southwest Airlines is the only other company in our sample set that owns the appropriate "sucks" domain and acknowledges the "sucks" part of the domain on the Web page that resolves. On southwestsucks.com, Southwest claims that they are protecting against inaccurate information and suggests that customers log on to the company's official page for what they need to know about the airline. Though this is not quite as constructive as Loews' approach, it still shows an awareness of the negative nature of the domain and presents a unique way of turning the domain into a more positive asset for the company by attempting to address customer grievances.

Beyond those companies that attempt to make use of the "sucks" domain names that they own are the companies that seem to register them purely for defensive purposes and simply warehouse them. In our study, 67 percent of the registered domains did not resolve (DNR) to any content whatsoever.

Copyright © 2008 - Duplication and Redistribution Prohibited.

**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

# Use of Registered Domains



- Does Not Resolve
- Registrar coming soon (ads)
- Gripe site
- Registrar coming soon (no ads)
- Company
- Error page
- Other use
- Blank page
- Third Party
- Domain for sale
- Gripe site for another company

Figure 1

Once again, an Internet user is most likely to land on a brandsucks.com page for one of two reasons. They can stumble upon it while searching for the actual brand or product via search engines and click on a link to it out of curiosity, or they may be looking for a gripe site via search or direct navigation in order to read consumer opinions or post their own. Either way, the user is not provided with a meaningful experience that reflects favorably on the brand. Chances are, if the customer was looking for a legitimate site and happened upon a page that does not resolve, they will shrug off the detour and continue on; if they were looking for a gripe site and couldn't find one, they might continue searching, or just be fed up and drop their search. The company is not successfully promoting its brand in either instance, and while this may be innocuous in the first case, it is a lost opportunity in the second.

Copyright © 2008 - Duplication and Redistribution Prohibited.



**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

Successful promotion of one's brand means always being where the customer expects you to be, and making a positive impact with your trademark whenever a worthwhile occasion presents itself. Given that the *brandsucks* domain is such an intuitive gripe name, it presents one of those opportunities. This study not only shows how overlooked this strategy is, but how a brand's lost opportunity can become another's gained opportunity.

According to Whois data, the Corporation Service Company (CSC) leads the pack of registrars in our data set serving as the registrar of record for about 41 percent of all the registered *brandsucks* domains on our list. According to its Web site, CSC is "the world's leading provider of corporate domain name management and brand protection services" as well as "the leading provider of trademark, domain and Internet solutions."[2] When you perform a Whois on microsoftsucks.com, "CSC Corporate Domains(sm) - Expert Global Domain Name Management for Corporations, Law Firms and IP Professionals"[3] appears at the top of your screen. However, Microsoft Corporation does not own this domain.

We did in fact find that CSC has processed the appropriate registrations of domains on behalf of the brand-owning companies that we examined in our study. However, 87 percent of CSC's *brandsucks* registrations were done on behalf of Dan Parisi, an infamous domain name speculator and cybersquatter, perhaps best known for maintaining a pornography Web site on the domain "whitehouse.com" for several years. Upon finding this trend, FairWinds alerted CSC and at the time of this paper's release has yet to receive a comment on the matter.

---

[2] http://www.cscprotectsbrands.com/html/about/history.html
[3] http://who.godaddy.com/WhoIs.aspx?domain=microsoftsucks.com&prog_id=godaddy

Copyright © 2008 - Duplication and Redistribution Prohibited.

**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

Early US case law protects registrars from trademark liability for the actions of their customers; the purpose of insulating registrars from such liability is to encourage the growth of the Internet industry, which could be crippled if registrars had to engage in a complicated and expensive trademark clearance for every purchase. However, brand owners must be aware that this provision also leaves them with fewer safeguards against the infringement of their brands and forces them to scrutinize the alignment of their partners' goals with their own.

Brand owners can create a safeguard against damaging infringement by developing a proactive domain name strategy that allows them to focus on what is most likely to be intuitive to users that practice direct navigation and stay one step ahead of cybersquatters. The lack of this type of strategy can leave brands in a situation similar to that of Dutch financial services institution Rabobank Group. A third party owns rabobanksucks.com and is pointing the domain to the IP address of Rabobank's global home page. As a result, someone browsing the site is provided with official Rabobank content along with the constant reminder that they are browsing it under the rabobanksucks.com moniker.

Sometimes, when brands find that a third party owns their *brandsucks* domain, they look to recover the name by leveraging the Uniform Dispute Resolution Policy (UDRP). In order to be successful, the brand owner would have to find that 1) the domain name in question is identical or confusingly similar to a trademark or a service to which the Complainant has rights, 2) the Respondent (the domain holder) has no rights or legitimate interests with respect to the domain name and 3) the domain name has been registered and is being used in bad faith. All three of these criteria must be met in order for a transfer to take place; otherwise, the complaint will be denied.[4]

---

[4] http://www.icann.org/udrp/udrp-policy-24oct99.htm

Copyright © 2008 - Duplication and Redistribution Prohibited.



**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

The application of these criteria, however, can vary greatly. In our data set, panels regularly noted that they were informed, though not bound, by the decisions of earlier arbitration panels. This is part of the flexibility of the UDRP, which is meant to secure its ability to handle new challenges that arise in the domain name space and reflect that trademark rights can differ depending on the country where the mark is used. At the same time, this does eliminate some predictability in the enforcement process and can leave brands uncertain of how to proceed. Taking a look at all 84 UDRP decisions on *brandsucks* domain names, however, produced some useful information on how UDRP proceedings tend to unfold.

Fifty-six percent of the complaints filed in the data set resulted in the transfer of the domain name to the trademark owner; 31 percent resulted in the complaint being denied. The rest of the disputes were either withdrawn (9 cases) or are still under review (1 case). According to WIPO, 80 percent of UDRP decisions in general favor the Complainant and lead to transfer. Therefore, *brandsucks* domains are significantly (30%) less likely to lead to transfer than other domain constructions that include a trademark or something that closely resembles a trademark.

### *Confusingly Similar Domains*

There are two schools of thought when evaluating the confusing similarity of a domain. On one hand, the consensus seems to be that "the fame of a mark does not always mean that consumers will associate all use of the mark with the mark's owner," which is particularly apt in the case of *brandsucks* domains.[5] These domain name arbitration panels decide that adding the word "sucks" to a domain does not constitute registration of a confusingly similar domain name, stating that "trademark owners,

---

[5] Kendall/Hunt Publishing Company v. headhunterbob, FA0111000102247 (NAF January 14, 2002)

Copyright © 2008 - Duplication and Redistribution Prohibited.



*Perspectives* Volume 3, Issue 6
Gripe Sites

indeed, are highly unlikely to disparage or parody their own goods or services."[6] The panel in the *Kendall/Hunt Publishing Company v. headhunterbob* dispute handled by the National Arbitration Forum (NAF) went so far as to say that "'sucks' is a pretty short word and it isn't a compliment," and "considering most beginning linguists learn curse words first, it is likely anyone with any command of the English language knows 'sucks' doesn't have a good connotation." [7]

On the other hand, brand owners attempt to prove the confusing similarity of "sucks" by pointing out that it is a slang term that may not be understood by non-Americans and therefore might be attributed to the brand owner in question. As stated by the panel of *Cabela v. Cupcake Patrol*, "courts and other UDRP Panels have recognized that the intentional registration of a domain name while knowing that the second-level domain contains another's valuable trademark weighs in favor of a likelihood of confusion". [8]

Since all three UDRP criteria need to be met, being unable to prove that the name meets the first criterion of confusing similarity would invalidate the complaint. However, cases that present overriding evidence of bad faith registration and a lack of legitimate interest in using the domain tend to settle the question in favor of the Complainant even if there is some uncertainty as to the similarity of the domain.

### *Legitimate Interest in Using the Domain*

A legitimate interest in registering and owning a domain can be proved by the following:

---

[6] Berlitz Investment Corp. v. Stefan Tinculescu, D2003-0465 (WIPO August 22, 2003)
[7] Homer TLC, Inc. v. GreenPeople, FA0508000550345 (NAF October 25, 2005)
[8] Cabela v. Cupcake Patrol, NAF Case No. FA95080 (August 29, 2001)

Copyright © 2008 - Duplication and Redistribution Prohibited.



1- use of, or demonstrable preparations to use, the domain name or a name corresponding to the domain name in connection with a bona fide offering of goods or services; or

2- being commonly known by the domain name, even if you have acquired no trademark or service mark rights; or

3- noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue.[9]

As one panel stated, "neither the courts in the United States of America nor panels in [Uniform Dispute Resolution] Policy proceedings have reached a clear consensus as to whether a critic may use her subject's trademark as a Web address to post critical commentary, even when (as in this proceeding) the gripe site is entirely non-commercial.[10] However, it is noteworthy that all of the UDRP complaints that were filed against general gripe sites serving as opinion forums resulted in the complaint being denied, presumably because, as another panel put it, "protest and commentary is the quintessential noncommercial fair use envisioned by the Policy."[11]

If a Web site is a bona fide protest site that does not derive revenue from its existence, it constitutes legitimate use of the domain and can therefore remain with the party that registered it. One decision specifically states that the UDRP is not a way to "insulate" trademark owners from criticism.[12] The same panel that claimed that any beginning linguist would be able to distinguish a "sucks" domain from the official brand site also had some choice words for complainants trying to transfer legitimate gripes

---

[9] http://www.icann.org/dndr/udrp/uniform-rules.htm
[10] Paul McMann v. J McEachern, D2007-1597 (WIPO February 9, 2008 )
[11] McLane Company, Inc. v. Fred Craig D2000-1455 (WIPO January 11, 2001)
[12] KB Home v. RegisterFly.com- Ref# 9323034 c/o Whois Protection Service- ProtectFly.com, FA0506000506771 (NAF August 30, 2005)

Copyright © 2008 - Duplication and Redistribution Prohibited.

**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

sites. In its decisions, the panel stated that, "Complaining has long been a favorite pastime of humanity and the Internet has not changed that" and "[the] Respondent is actually using Complainant's trademark correctly because Respondent is referring to Complainant and its business."[13]

It is important that brand owners understand fair use and what it means for their brand enforcement strategy. Cybersquatters and many legitimate third-party registrants are well read on policy and understand both their vulnerabilities and a brand's. For example, the owner of virginmediasucks.com has set up a gripe site about Virgin Media's service, and has included a note to lawyers at the bottom of his site declaring that he is "very well aware of WIPO regulations and trademark laws" and asks that they not send any "pointless threatening letters."[14] Brand owners should be just as aware of their rights, so that they can properly enforce their brand and avoid allocating resources to UDRPs that won't be resolved in their favor. If brands are armed with sufficient regulatory knowledge, perhaps they can preempt the need for a UDRP altogether and register valuable sites that, once lost, are unlikely to be regained.

The UDRP decision surrounding "salvationarmysucks.com" is interesting because it seemed as though the Respondent did express a legitimate interest in developing the site in precisely a way that would insulate it from complaint. Upon its registration, the Respondent sent the Complainant (the Salvation Army) a letter stating that his intentions were to have the Web site act as a "free speech" zone where criticisms of the Salvation Army could be posted. This letter was sent in July of 2000, well before the March 2001 filing date of the complaint. However, the registrant's offer to sell the domain to the

---

[13] Homer TLC, Inc. v. GreenPeople, FA0508000550345 (NAF October 25, 2005)
[14] http://virginmediasucks.com/

Copyright © 2008 - Duplication and Redistribution Prohibited.



**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

Complainant in return for silence was enough to disprove his claims of 'legitimate interest.'

In the Respondent's letter, it was written that he "will agree not to publish a derogatory article singularly about [the Complainant's] client with regard to this topic, if this matter is handled as [he has] outlined in this letter."[15] The Respondent goes on to attempt to dissuade the Complainant from filing a complaint, by claiming that litigation will cost more than just buying the domain according to the terms outlined in the letter. As the panel in *Wal-Mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico* points out, "it is as if a newspaper were to approach the potential subject of an adverse investigative report to propose that for an appropriate fee the report could be avoided. This would not be characterized as 'free speech' activity. It would rather be characterized as 'extortion'."[16]

As a result, the letter's claim of free speech and criticism was not found to be persuasive, and the Panel decided that the Respondent registered the name in bad faith with no intentions to pursue legitimate interests. In fact, all complaints that have been brought against third parties trying to sell a brand's "sucks" domain have resulted in the transfer of the name to the brand.

While our UDRP decision data set provided insight into what Web site content can be considered proof of legitimate interests, it also provided a glimpse into what the absence of content can prove. There was one "brandsucks" UDRP filed for a domain name that was not developed into a site. According to the panel of *Quilogy, Inc. v. Rodney Ruddick*, the fact that the Web site was undeveloped constituted "passive

---

[15] The Salvation Army v. Info-Bahn, Inc., D2001-0463 (WIPO May 10, 2001
[16] Wal-Mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico, D2000-0477 (WIPO July 20, 2000)

Copyright © 2008 - Duplication and Redistribution Prohibited.



FAIRWINDS PARTNERS
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

holding" of the domain, which "does not give rise to rights or legitimate interests."[17] The domain was ultimately ordered for transfer.

This question of whether the mere registration of a domain name without any active use can possibly constitute a lack of legitimate interest or bad faith registration has been a point of contention among UDRP panels. There are panels that believe that it is bad faith unless there is active use that rises to the level of a right or legitimate interest, but others feel that the UDRP requires active use of the site in order to judge the validity of a complaint. Many cybersquatters look to avoid enforcement by leaving their domains undeveloped because of those panels that require an active use of the site to consider intent. All of the sites in our data set that are owned by Dan Parisi, for example, do not resolve. These panels may also cause brands to doubt the utility of filing a complaint and make them hesitant to pursue infringements. However, in light of decisions such as *Quilogy, Inc. v. Rodney Ruddick*, infringements of domains—especially those committed by serial infringers—can be pursued with the UDRP.

### *Bad Faith Registration of a Domain*

The registration of a domain in bad faith can be proved by:

1- circumstances indicating that the domain name has been registered or acquired primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to the Complainant who is the owner of the trademark or service mark or to a competitor of that Complainant, for more than the out-of-pocket costs directly related to registering the domain name; or

---

[17] Quilogy, Inc. v. Rodney Ruddick, FA0211000134653 (NAF January 9, 2003)

Copyright © 2008 - Duplication and Redistribution Prohibited.

FAIRWINDS PARTNERS
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

2- the domain name has been registered in order to prevent the owner of the trademark or service mark from reflecting the mark in a corresponding domain name, provided that you have engaged in a pattern of such conduct; or

3- the domain name has been registered primarily for the purpose of disrupting the business of a competitor; or

4- the domain name is being used intentionally to attract, for commercial gain, Internet users by creating a likelihood of confusion with the Complainant's mark as to the source, sponsorship, affiliation, or endorsement of the Web site or location or of a product or service on the Web site or location.[18]

Bad faith registrations of *brandsucks* domains were often proven through attempts on the part of the registrants to sell a domain to the owner of the brand contained within the domain. It appears that such activity reveals awareness of a domain's similarity and value to the brand, and therefore shows its registration and use to be an act of bad faith. A good example of this is the group of complaints brought forth by *Wal-Mart Stores, Inc.*, against *Walsucks* and *Walmarket Puerto Rico* over five domains that include walmartpuertoricosucks.com. These proceedings determined that the Respondents clearly had no legitimate business claims to the domains, and registered names "primarily for disrupting the business of a competitor" and resulted in a transfer of the names in question.[19]

The domain holder's intent seemed to be the most important element in determining bad faith, and was often decided by the "I know it when I see it" approach. In these cases, the UDRP panels decided to look to the US Ninth Circuit Court of

---

[18] http://www.icann.org/dndr/udrp/uniform-rules.htm
[19] Wal-Mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico, D2000-0477 (WIPO July 20, 2000 )

Copyright © 2008 - Duplication and Redistribution Prohibited.



FAIRWINDS PARTNERS
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

Appeals, which stated that "the law has long been established that if an infringer 'adopts his designation with the intent of deriving benefit from the reputation of the trademark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities.'"[20] The panel decision on the UDRP that was filed maintained that the Respondent registered the domain knowing that it would be effective if it contained Wal-Mart's trademark and the Respondent had a recorded history of trying to extort money from Wal-Mart with his domain registrations. A panel for another UDRP had "no difficulty in finding bad faith registration and use" since the "Respondent has shown a cynical pattern of dealing in domain names with apparent attempt to embarrass the owners of internationally known marks. The fact that Internet users are diverted to the Respondent's sites is evidence of bad faith."[21] The panel goes on to say that it "is not in a position, however, to judge whether the criticism found on the Respondent's Web sites is valid or libelous," so that again, future panels can be informed, but not bound by, the decisions made for this particular case.[22]


## *Conclusion*


Brand owners have a lot to consider when playing the domain name game with *brandsucks* domains. Purely defensive registrations are often unnecessary expenditures; however, as mentioned before, a *brandsucks* domain can be an effective offensive tool for protecting a brand's reputation because of its widely regarded popularity for designating a gripe site. Brands need to adopt the same strategy for their domain name portfolios as any other crucial aspect of their marketing plan: optimize while maintaining cost and time efficiency. As always, a company that stays informed of updates in the domain name space from trusted advisors, keeps on top of developing trends and shifts in

---

[20] Wal-Mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico, D2000-0477 (WIPO July 20, 2000)
[21] ADT Services AG v. ADT Sucks.com, D2001-0213 (WIPO April 23, 2001)
[22] ADT Services AG v. ADT Sucks.com, D2001-0213 (WIPO April 23, 2001)

Copyright © 2008 - Duplication and Redistribution Prohibited.



**FAIRWINDS PARTNERS**
INTERNET STRATEGY CONSULTING

*Perspectives* Volume 3, Issue 6
Gripe Sites

policy, employs a carefully proactive approach, and understands Internet user behavior will be better positioned to effectively leverage its brand online.

By being proactive, brands can avoid the need for the reactive, costly and uncertain UDRP. However, a proper brand enforcement strategy should be in place to deal with problematic infringements as they crop up. Brands need to strike back when appropriate so that when they do file UDRPs, they have reasonable assurance of success and a positive ROI from newfound traffic or decreased consumer and reputation harm. Finally, brand owners could gain much by forming a united front against online fraud and coming together to share their experiences, brainstorm new defenses and provide their consumers with safe and positive online experiences.

The data sets used to perform the research outlined in this paper are available on FairWinds Partners' Web site. We encourage you to review the <u>list of registered domains</u> if you are curious about who owns your domain and how they are using it, and the <u>list of UDRP complaints</u> involving "sucks.com" to learn about filing a successful UDRP against this type of gripe site.

Special thanks to Diane Cabell, corporate counsel for Creative Commons, for her contributions to this paper.

Copyright © 2008 - Duplication and Redistribution Prohibited.

E
08-1465
PLF

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|

I (a) PLAINTIFFS

Corporation Service Company

88888

DEFENDANTS

FairWinds Partners, LLC
Joshua Bourne
Philip Lodico

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Deborah B. Baum and Thomas G. Allen
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, NW
Washington, DC 20037-1128
202-663-8000

Case: 1:08-cv-01465
Assigned To : Friedman, Paul L.
Assign. Date : 8/22/2008
Description: General Civil

JURY
ACTION

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

◉ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | **Any nature of suit from any category may be selected for this category of case assignment.**<br><br>*(If Antitrust, then A governs)* |

| ◉ E. *General Civil (Other)*    OR    ○ F. *Pro Se General Civil* |
|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant)<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

3

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ◯ 2 Removed from State Court  ◯ 3 Remanded from Appellate Court  ◯ 4 Reinstated or Reopened  ◯ 5 Transferred from another district (specify)  ◯ 6 Multi district Litigation  ◯ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Civil Statute: Lanham Act, 15 U.S.C.A. Section 1051 et seq. Complaint for Trade Libel and Misappropriation of Trade Secrets.

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ TBD   Check YES only if demanded in complaint
JURY DEMAND:   YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY**  (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 8/22/08   SIGNATURE OF ATTORNEY OF RECORD _[signature]_

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.